1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JOE EARL SHEPARD,

11            Petitioner,                    No. 2:10-cv-3249 EFB P

12        vs.

13   F. X. CHAVEZ,

14            Respondent.            <u>ORDER</u>

15   _____/

16        Petitioner is a state prisoner without counsel seeking an application for a writ of habeas

17   corpus pursuant to 28 U.S.C. § 2254.  The parties in this action have consented to proceed before

18   a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  Petitioner challenges a 2004

19   judgment of conviction entered against him in the Tehama County Superior Court on charges of

20   committing a lewd and lascivious act upon a child under the age of 14 years and continuous

21   sexual abuse of a minor.  He seeks relief on the grounds that: (1) the trial court violated his

22   federal constitutional rights by denying his motions for substitute counsel; (2) his trial and

23   appellate counsel rendered ineffective assistance; and (3) his sentence is unconstitutional.  Upon

24   careful consideration of the record and the applicable law, petitioner's application for habeas

25   corpus relief must be denied.

26   ////

**I.      Procedural and Factual Background[1]**

A jury convicted defendant Joseph Earl Shepard of committing sexual offenses against V. and B., two girls under 14 years of age. On appeal, defendant argues the court abused its discretion by denying his motions to continue and to substitute retained counsel for his appointed counsel.  We will affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

**Facts Related to the Offenses**

**Count I**

Count I arose from an incident that occurred on September 29, 2001, at the Red Bluff residence of defendant's mother-in-law, who shared her home with defendant and his wife.  After an evening of bowling, defendant was left to babysit his son and daughter and the two daughters of his wife's friend, while his wife and her friend went out for drinks.

Defendant directed his children to put on their pajamas and go to bed.  Defendant invited the younger of the other two girls, six-year-old V., to join him on the sofa, and sent her older sister to his bedroom.  Defendant laid sideways on the sofa and positioned V. in front of him.  As V. pretended to sleep, defendant put his hand underneath her shorts, "squeezed [her] bottom," and "humped" her by repeatedly moving his pelvis against her buttocks.  Defendant stopped when V. pretended to wake up. Defendant permitted V. to join her sister in defendant's bedroom, where she began crying.  V.'s 10-year-old sister corroborated V.'s account in part, testifying that V. did not go to sleep upon entering the bedroom, but stared out of the window and cried.

In defense of this charge, defense counsel was able to adduce evidence that V. may have waited up to 30 months before reporting the incident to her mother; V. continued to visit B. after the incident, even though defendant was present; and there were factual discrepancies between the accounts V. and her sister gave an investigating detective.  In addition, defendant testified that he had sexual intercourse with V.'s mother on several occasions; V.'s mother and his then-wife had a "relationship," and frequently went drinking and dancing together.

////

---

[1]  In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary.

Defendant was convicted of one count of committing a lewd and lascivious act upon a child under the age of 14 years. (Pen.Code, § 288, subd. (a).)[2]

**Count II**

Defendant also sexually molested B., a young girl who occasionally stayed at his mother-in-law's residence.  B., who was nine years old at the time of trial, testified that defendant had sexual intercourse with her on multiple occasions when she was five, six, and seven years old.  All but one of the sexual assaults followed the same pattern.  With B. lying on her back in bed, defendant would lower her panties, pull his erect penis through the hole in his boxer underwear, insert it into her vagina, move up and down, and ejaculate.  B. testified defendant's penis went about "halfway" into her vagina, to a depth of about two inches. Defendant told B.: "This is our little secret."

The one atypical incident occurred while defendant was giving B. a ride in his car, and B.'s brother was asleep in the backseat. Defendant pulled his erect penis from his pants, put B.'s hand on it, and made her stroke it.

Sandra Relyea, a pediatric physician assistant, examined B. in May 2003.  Relyea testified that B.'s hymen was "nearly absent," a condition that was consistent with repeated internal vaginal trauma, as would occur as a result of multiple acts of sexual intercourse.  Relyea noted that she observed no external vaginal injuries, but she did not deem this significant, since external vaginal injuries heal rapidly, the sexual assaults occurred long before the examination, and an adult penis could have penetrated B.'s vagina without causing any exterior damage.

In defense of count II, defense counsel elicited testimony that B. was "not afraid" to return to the residence when defendant was present after the molestations commenced; defendant's mother-in-law noticed nothing unusual when she bathed B., and B. never complained to her; B. did not tell her mother about the molestations until her mother asked if defendant had "ever done anything bad"; B.'s mother questioned B. only after she was informed of the alleged molestation of V.; and defendant reported that B.'s mother had committed welfare fraud, which led to a misdemeanor conviction.

////

////

---

[2]  Hereafter, undesignated statutory references are to the Penal Code.

3

1      The jury convicted defendant of continuous sexual abuse of a
       minor. (§ 288.5.)[3]

2

3  Resp.'s Lodg. Doc. 4 (hereinafter Opinion) at 1-4.[4]

4      Before the California Court of Appeal issued its decision on petitioner's direct appeal,

5  petitioner filed two collateral challenges to his judgment of conviction.  Specifically, on June 6,

6  2006, petitioner, proceeding through counsel, filed a petition for writ of habeas corpus in the

7  Tehama County Superior Court, claiming that his trial counsel rendered ineffective assistance in

8  failing to call an expert witness (Dr. Kessler) at his trial and failing to investigate key defense

9  witnesses.  Resp.'s Lodg. Doc. 6.  That petition was denied on October 23, 2006.  Resp.'s Lodg.

10  Doc. 7.  In its order denying habeas relief, the Superior Court discussed petitioner's claims on

11  the merits and indicated that petitioner had not met his burden of demonstrating ineffective

12  assistance of counsel.  *Id.* at 2.  However, the court stated that because the matter was currently

13  on appeal and the Superior Court was not in possession of the state court record, it would be

14  "inappropriate" to issue a writ of habeas corpus at that time.  *Id.* at 2.

15      On February 6, 2007, petitioner, still proceeding through counsel, filed a petition for writ

16  of habeas corpus in the California Court of Appeal, raising the same claims of ineffective

17  assistance of trial counsel that he raised in his habeas petition filed in the Superior Court.

18  Resp.'s Lodg. Doc. 8.  On March 1, 2007, that petition was summarily denied.  Resp.'s Lodg.

19  Doc. 9.

20  _____

21      [3]  The jury acquitted defendant of count III, which alleged defendant committed a lewd
    and lascivious act upon K., a girl who was eight years old at the time of the alleged offense.  K.

22  testified that while she and B. were wrestling with defendant, he put his hand on her chest and
    between her legs.  K. testified that defendant touched B. in the same manner.  K. did not feel

23  right being touched on those parts of her body.  Defense counsel elicited acknowledgment from
    K. that they were all laughing and having fun while wrestling.  Counsel also established that

24  defendant had sexual intercourse with K.'s mother on one occasion.

25      [4]  Petitioner informs the court, and the court has independently verified, that while
    petitioner was in custody on the instant charges he was charged in a separate criminal case with

26  lewd and lascivious acts on a child under the age of fourteen years.  *See* Dckt. No. 1 at 10, 11.
    Petitioner was acquitted of all charges filed against him in that case.  *Id.*

1    On March 9, 2007, the California Court of Appeal denied petitioner's direct appeal and

2    affirmed his judgment of conviction.  Petitioner did not file a petition for review.

3    Petitioner subsequently filed two more collateral challenges to his conviction.  On June

4    25, 2009, more than two years after his conviction was upheld by the California Court of Appeal,

5    petitioner, now proceeding without counsel, filed a petition for writ of habeas corpus in the

6    California Supreme Court.  Resp.'s Lodg. Doc. 10.  Therein, petitioner explained that his

7    appellate counsel failed to file a petition for review in the California Supreme Court despite

8    having promised to do so, and requested that the court reopen his appeal so that he could

9    continue the appellate process.  *Id.*  On November 10, 2009, that petition was summarily denied.

10   Resp.'s Lodg. Doc. 11.  On April 1, 2010, petitioner, still proceeding without counsel, filed

11   another petition for writ of habeas corpus in the California Supreme Court.  Resp.'s Lodg. Doc.

12   12.  Therein, he claimed that his trial and appellate counsel rendered ineffective assistance, that

13   the trial court erred in denying his motions for substitute counsel, and that his sentence was

14   illegal.  *Id.*  The Supreme Court denied that petition by order dated October 27, 2010, citing *In re*

15   *Robbins*, 18 Cal.4th 770, 780 (1998) and *In re Clark*, 5 Cal.4th 750 (1993).  Resp.'s Lodg. Doc.

16   13.

17   **II.    Analysis**

18       **A.  Standards for a Writ of Habeas Corpus**

19   An application for a writ of habeas corpus by a person in custody under a judgment of a

20   state court can be granted only for violations of the Constitution or laws of the United States.  28

21   U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

22   application of state law.  *See Wilson v. Corcoran*, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010);

23   *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir.

24   2000).

25   ////

26   ////

5

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the state court decision. *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (*citing Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Nonetheless, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." *Stanley*, 633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[5] *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ

---

[5] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

1     simply because that court concludes in its independent judgment that the relevant state-court

2     decision applied clearly established federal law erroneously or incorrectly.  Rather, that

3     application must also be unreasonable."  *Williams*, 529 U.S. at 412.  *See also Schriro v.*

4     *Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal

5     habeas court, in its independent review of the legal question, is left with a 'firm conviction' that

6     the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit

7     precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness

8     of the state court's decision."  *Harrington v. Richter*, 562 U.S.___,___,131 S. Ct. 770, 786

9     (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a

10     condition for obtaining habeas corpus from a federal court, a state prisoner must show that the

11     state court's ruling on the claim being presented in federal court was so lacking in justification

12     that there was an error well understood and comprehended in existing law beyond any possibility

13     for fairminded disagreement."  *Harrington*,131 S. Ct. at 786-87.

14         If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

15     court must conduct a de novo review of a habeas petitioner's claims.  *Delgadillo v. Woodford*,

16     527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

17     (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

18     2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

19     considering de novo the constitutional issues raised.").

20         The court looks to the last reasoned state court decision as the basis for the state court

21     judgment.  *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

22     If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

23     previous state court decision, this court may consider both decisions to ascertain the reasoning of

24     the last decision.  *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When

25     a federal claim has been presented to a state court and the state court has denied relief, it may be

26     presumed that the state court adjudicated the claim on the merits in the absence of any indication

or state-law procedural principles to the contrary." *Harrington*, 131 S. Ct. at 784-85.  This

presumption may be overcome by a showing "there is reason to think some other explanation for

the state court's decision is more likely." *Id*. at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797,

803 (1991)).  Where the state court reaches a decision on the merits but provides no reasoning to

support its conclusion, a federal habeas court independently reviews the record to determine

whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v.*

*Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo

review of the constitutional issue, but rather, the only method by which we can determine

whether a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853.

Where no reasoned decision is available, the habeas petitioner still has the burden of "showing

there was no reasonable basis for the state court to deny relief." *Harrington*, 131 S. Ct. at 784.

When it is clear, however, that a state court has not reached the merits of a petitioner's

claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

habeas court must review the claim de novo. *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462

F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook,* 333 F.3d 1052, 1056 (9th Cir. 2003).[6]

**B.  Petitioner's Claims**

Petitioner has raised eight separate claims for habeas corpus relief in the petition before

the court.  Respondent argues that all of petitioner's claims are barred from federal review by the

doctrine of procedural default.  The court will address petitioner's claims and respondent's

argument regarding procedural default below.

**1.  Procedural Default**

Petitioner raised the claims that are designated in the instant petition as claims two and

three in his petitions for a writ of habeas corpus filed in the Tehama County Superior Court and

---

[6]  The United States Supreme Court has recently granted certiorari in a case apparently to consider this issue. *See Williams v. Cavazos*, 646 F.3d 626, 639-41 (9th Cir. 2011), *cert. granted in part*, ___U.S.___, 132 S. Ct. 1088 (2012).

1   the California Court of Appeal in 2007, and he raised them again in his second petition for a writ

2   of habeas corpus filed in the California Supreme Court in 2010.  Petitioner raised claim one on

3   direct appeal and in his second petition for writ of habeas corpus filed in the California Supreme

4   Court.  Resp.'s Lodg. Doc. 12 (ground 2).  Petitioner raised claims four through eight for the first

5   time in his second petition for a writ of habeas corpus filed in the California Supreme Court.

6   Resp.'s Lodg. Doc. 12.  Accordingly, petitioner raised all of his claims in his second petition

7   filed in the California Supreme Court.  As described above, the Supreme Court denied

8   petitioner's second habeas petition with the following language: "The petition for writ of habeas

9   corpus is denied.  (*See In re Robbins* (1998) 18 Cal.4th 770, 780; *In re Clark* (1993) 5 Cal.4th

10   750.)."  Resp.'s Lodg. Doc. 13.  Respondent argues that the California Supreme Court's citation

11   to *In re Robbins* and *In re Clark* constitutes a state procedural timeliness bar which precludes

12   this court from considering the merits of petitioner's claims.  Dckt. No. 25 at 17-18.`

13        As a general rule, "[a] federal habeas court will not review a claim rejected by a state

14   court 'if the decision of [the state] court rests on a state law ground that is independent of the

15   federal question and adequate to support the judgment." *Walker v. Martin*, 562 U.S.___, ___,

16   131 S. Ct. 1120, 1127 (2011) (quoting *Beard v. Kindler*, 558 U.S. ___, ___, 130 S. Ct. 612, 615

17   (2009).  *See also Maples v. Thomas*, ___U.S.___, ___, 132 S. Ct. 912, 922 (2012); *Greenway v.*

18   *Schriro*, 653 F.3d 790, 797 (9th Cir. 2011); *Calderon v. United States District Court (Bean)*, 96

19   F.3d 1126, 1129 (9th Cir. 1996) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).  In

20   order for a state procedural rule to be found independent, the state law basis for the decision

21   must not be interwoven with federal law.  *Cooper v. Neven*, 641 F.3d 322, 332 (9th Cir. 2011);

22   *Bennett v. Mueller*, 322 F.3d 573, 581 (9th Cir. 2003); *LaCrosse v. Kernan*, 244 F.3d 702, 704

23   (9th Cir. 2001).  To be deemed adequate, the rule must be well established and consistently

24   applied.  *Walker*, 131 S. Ct. at 1128; *James v. Schriro*, 659 F.3d 855, 878 (9th Cir. 2011);

25   *Greenway*, 653 F.3d at 797-98; *Poland v. Stewart*, 169 F.3d 575, 577 (9th Cir. 1999).  Even if

26   the state rule is independent and adequate, the claims may be reviewed by the federal court if the

1   petitioner can show:  (1) cause for the default and actual prejudice as a result of the alleged

2   violation of federal law; or (2) that failure to consider the claims will result in a fundamental

3   miscarriage of justice.  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000);*Coleman*, 501 U.S. at

4   749-50; *see also Maples*, 132 S. Ct. at 922.

5          Here, the California Supreme Court's citation to *In re Robbins* and *In re Clark* reflects

6   that the petition was denied because it was untimely filed.  *Martin*, 131 S.Ct. at 1122 ("A

7   summary denial citing *Clark* and *Robbins* means that the petition is rejected as untimely.").[7]

8   Denial of habeas relief by the California Supreme Court on the grounds that the application for

9   relief was not timely filed is an independent and adequate state procedural ground requiring

10  denial of a subsequent habeas petition in federal court.  *Martin*, 131 S.Ct. 1120.  *See also Alvarez*

11  *v. Wong*, No. 09-15547, 425 Fed. Appx. 652 (9th Cir. Apr. 5, 2011).  However, before finding a

12  procedural default, "federal courts must carefully examine state procedural requirements to

13  ensure that they do not operate to discriminate against claims of federal rights."  *Martin*, 131

14  S.Ct. at 1130.

15         There is no evidence in the record that the timeliness bar was imposed in this case by the

16  California Supreme Court in an attempt to discriminate against petitioner's claims of federal

17  _____

18      [7]  This court notes that *In re Clark* also held that "generally, absent justification for the
    failure to present all known claims in a single, timely petition for a writ of habeas corpus,
19  successive or untimely petitions will be summarily denied."  5 Cal.4th at 750.  In this case, the
    California Supreme Court's citation to *In re Clark* may have been based on the fact that
20  petitioner had not raised his claims in the first habeas petition he filed in that court, and not
    necessarily because they were untimely.  In this regard, the court notes that petitioner's claims
21  two and three were raised in the California Superior Court and California Court of Appeal before
    his direct appeal had been decided by the California Court of Appeal and were therefore clearly
22  not untimely.  On the other hand, petitioner did not raise claims four through eight until he filed
    his second habeas petition in the California Supreme Court two years after his direct appeal was
23  concluded.  California case law reflects that petitioner's two year delay qualified as
    "substantial."  *See, e.g., In re Tsaturyan*, No. B156012, 2002 WL 1614107, *3 (Cal.App., July
24  23, 2002) (delay of 16 months barred claim); *In re Miller*, No. B186447, 2006 WL 1980385,
    *2–3 (Cal.App., July 17, 2006) (delay of two years and six months barred claim).  In any event,
25  as noted above, the United States Supreme Court has concluded that a California court's citation
    to *In re Clerk* and *In re Robbins* means that the petition was not timely filed.  *Martin*, 131 S.Ct.
26  at 1122.  Accordingly, the court will assume that this was the basis for the California Supreme
    Court's decision here.

1   rights or that it was imposed in an unfair manner.  There is also no basis for concluding that the

2   imposition of California's timeliness rule here operated to "the particular disadvantage of

3   petitioners asserting federal rights." *Martin*, 131 S.Ct. at 1131.  *See also Kindler*, 130 S.Ct. at

4   620 (Kennedy, J., concurring) (a state procedural ground would be inadequate if the challenger

5   shows a "purpose or pattern to evade constitutional guarantees").  Because California's

6   timeliness rule is a valid procedural ground for precluding federal review of petitioner's claims,

7   the court concludes that petitioner has procedurally defaulted these claims.  *Martin*, 131 S.Ct.

8   1127.  Therefore, the court may only reach the merits of petitioner's claims if he shows cause

9   and prejudice or that failure to consider the claims will result in a fundamental miscarriage of

10  justice.[8]

11      The United States Supreme Court has held that "the existence of cause for a procedural

12  default must ordinarily turn on whether the prisoner can show that some objective factor external

13  to the defense impeded . . . efforts to comply with the state's procedural rule." *Murray v.*

14  *Carrier*, 477 U.S. 478, 488 (1986).  *See also Coleman*, 501 U.S. at 753 (cause for a procedural

15  default exists where "something *external* to the petitioner, something that cannot fairly be

16  attributed to him[,] . . . 'impeded [his] efforts to comply with the State's procedural rule.'").  "To

17  establish prejudice resulting from a procedural default, a habeas petitioner bears 'the burden of

18  showing not merely that the errors at his trial constituted a possibility of prejudice, but that they

19  worked to his actual and substantial disadvantage, infecting his entire trial with errors of

20  constitutional dimension.'"  *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989) (citing *United*

21  *States v. Frady*, 456 U.S. 152, 170 (1982)).  To show that a failure to consider the merits of a

22

23      [8]  A procedural default is to be measured at the time the petitioner was in violation of the
    state created procedural bar.  *See Fields v. Calderon*, 125 F.3d 757, 760 (9th Cir.  1997).  Here,
    petitioner's untimely and successive habeas petition was filed in the California Supreme Court in
24  2009 and he was therefore in violation of the bar at that time.  In *Martin*, the petitioner's default
    occurred in 2002.  However, there is nothing in the record demonstrating that the California
25  courts' application of the *Clark/Robbins* timeliness bar has changed since 2002.  Accordingly,
    the undersigned finds that *Martin* determines the outcome of the procedural default issue in this
26  case, notwithstanding the different time periods that the defaults occurred.

claim would result in a fundamental miscarriage of justice, a petitioner must establish factual

innocence. *Schlup v. Delo*, 513 U.S. 298, 327 (1995).  The burden of establishing cause and

prejudice or a fundamental miscarriage of justice rests with the petitioner.  *White*, 874 F.2d at

603; *Wildman v. Johnson*, 261 F.3d 832, 842–43 (9th Cir. 2001).

Petitioner argues that he has established cause for his failure to appropriately present his

claims to the California Supreme Court in one, timely filed petition.  He alleges, and provides

supporting evidence, that his appellate counsel failed to tell him about the outcome of his direct

appeal until approximately one year after the appeal had been denied.  Dckt. No. 26 at 2, 81.  By

that time, the deadline for filing a petition for review had expired.  *Id.* at 2, 74.  Appellate

counsel later acknowledged in a letter to petitioner that he was at fault for failing to file a timely

petition for review, but he promised that he would file a petition for a writ of habeas corpus in

the California Supreme Court on petitioner's behalf.  *Id.* at 2, 70.  However, counsel failed to file

the promised habeas petition.  He also refused to give petitioner his case files despite petitioner's

numerous requests for the files.  *Id.* at 2, 74.  Petitioner subsequently filed a complaint with the

State Bar of California in which he explained the actions of his appellate counsel and sought to

get possession of his case files.  *Id.* at 2, 73.  In response to petitioner's complaint, the State Bar

sent appellate counsel a warning letter, whereupon, in February 2010, counsel finally gave

petitioner his case files.  *Id.* at 2, 77-79.  Petitioner states that this was the first time he was able

to ascertain which claims had been raised and which claims still needed to be raised.  *Id.* at 2.

Petitioner also explains that the purpose of the first habeas petition he filed in the

California Supreme Court was to request that, in light of the circumstances outlined above, he be

allowed to proceed with a petition for review.  *Id.* at 3.  Petitioner states that he did not

understand that he should have presented his claims to the California Supreme Court in that

petition.  He argues that his second habeas petition filed in that court, in which he actually

presented his claims, should have been construed as "an extension" of his first petition."  *Id.*  In

short, petitioner contends that his procedural default was caused by the ineffective assistance of

12

his appellate counsel in failing to file a petition for review or a petition for writ of habeas corpus in the California Supreme Court after promising to do so, and in failing to give petitioner his case files so that he could file timely challenges to his conviction on his own behalf.

Ineffective assistance of counsel will establish cause to excuse a procedural default if it was "so ineffective as to violate the Federal Constitution." *Edwards*, 529 U.S. at 451 (citing *Carrier*, 477 U.S. at 486–88). *See also Cook v. Schriro*, 538 F.3d 1000, 1027 (9th Cir. 2008). The ineffective assistance claim must be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default. *Edwards*, 529 U.S. at 451 (citing *Carrier*, 477 U.S. at 489.) Here, as noted above, petitioner presented his ineffective assistance of appellate counsel claim to the state courts as an independent claim and has therefore cleared this hurdle.

An attorney's ignorance, inadvertence or negligence "is not 'cause' [for excusing procedural default] because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error.'" *Coleman*, 501 U.S. at 753 (quoting *Carrier*, 477 U.S. at 488. However, an attorney who "abandons his client without notice . . . sever[s] the principal-agent relationship" and "no longer acts, or fails to act, as the client's representative." *Maples*, 132 S.Ct. at 922–23 (cause for the petitioner's state procedural default of failing to file a timely appeal in state court shown where petitioner was abandoned by counsel during post-conviction proceedings and lacked notice that he needed to protect himself by proceeding pro se). When an attorney abandons his client, "[the attorney's] acts or omissions . . . 'cannot fairly be attributed to [the client]'" and may constitute cause to excuse a procedural default. *Id.* at 923 (quoting *Coleman*, 501 U.S. at 753, 111 S.Ct. 2546). *See also Towery v. Ryan*, 673 F.3d 933, 942 (9th Cir. 2012) ("Withdrawal, whether proper or improper, terminates the lawyer's authority to act for the client," and "[t]he client is not bound by acts of a lawyer who refuses to represent the client."). *Cf. Martinez v. Ryan*, ___U.S. ___, 132 S.Ct. 1309, 1320 (2012) ("[W]here, under state law, claims of ineffective assistance of trial

1   counsel must be raised in an initial-review collateral proceeding, a procedural default will not

2   bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in

3   the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was

4   ineffective.").

5          Here, petitioner's appellate counsel abandoned him without notice when he: (1) failed to

6   inform petitioner that his direct appeal had been denied; (2) failed to file a timely petition for

7   review; (3) failed to file a petition for writ of habeas corpus in the California Supreme Court

8   after promising to do so; and (4) refused to give petitioner his files until he was contacted by the

9   State Bar.  Because of appellate counsel's inaction, petitioner's claims were not presented to the

10  California courts in a posture where they could be addressed on the merits.  By the time

11  petitioner tried to present his claims, they were subject to a state procedural bar.  As in *Maples*,

12  "abandoned by counsel, [petitioner] was left unrepresented at a critical time for his state

13  postconviction petition, and he lacked a clue of any need to protect himself *pro se*."  132 S.Ct. at

14  917.  Appellate counsel's inaction and failures, set forth above, essentially left petitioner

15  "without any functioning attorney of record."  *Id.* at 927.  Under these circumstances the

16  petitioner has demonstrated cause to excuse his procedural default.  *Id. Cf. Towery*, 673 f.3d at

17  942 (petitioner's trial counsel did not "abandon" him by failing to include an exhausted claim in

18  federal habeas petition); *Moorman v. Schriro*, 672 F.3d 644 (9th Cir. 2012) (petitioner's

19  appellate counsel did not abandon him, so as to excuse procedural default of claim, where

20  petitioner was always represented by active counsel who sought to further his arguments).

21         However, as noted above, petitioner must also demonstrate prejudice in order to

22  overcome the procedural bar imposed by the California Supreme Court.  For the reasons detailed

23  below, an analysis of petitioner's claims reflects that none of the alleged errors were of

24  ////

25  ////

26  ////

14

1   constitutional dimension.  For this reason, petitioner's claims fail on their merits and he is unable

2   to establish prejudice sufficient to overcome the procedural bar.[9]

3                     **2.  Substitution of Counsel (Claim One)**

4           In his first claim for relief, petitioner argues that he was "denied the right to use counsel

5   of his own choice" when the trial court refused to allow him to substitute retained counsel for his

6   court appointed counsel shortly before the start of trial.  Dckt. No. 1 at 4.  He argues that the trial

7   court's error was "structural" and "not subject to review for harmlessness."  *Id.* at 7.

8           The California Court of Appeal explained the background to this claim, as follows:

9           **Facts Related to the Motion to Continue Trial and the Motion
            to Substitute Retained Counsel for Appointed Counsel**

10

11          At the arraignment hearing held on September 8, 2003, Dane
            Cameron appeared for defendant, who entered pleas of not guilty
            to all charges.

12

13          On October 6, 2003, the court set a trial date of November 12,
            2003.

14          On October 14, 2003, defendant moved to continue the trial
            because two of his expert witnesses were unavailable during the

15          week set for trial.  The People objected based on the negative
            effects of delay on the minor victims, as well as the statutory

16          requirement that trial be commenced within 30 days of

17

18

19          [9]  Petitioner may also overcome the procedural bar if he demonstrates that he is factually
     innocent of the crimes for which he was convicted.  *See Gandarela v. Johnson*, 286 F.3d 1080,
20   1085–86 (9th Cir. 2002) ("A petitioner may establish a procedural gateway permitting review of
     defaulted claims if he demonstrates "actual innocence") (citing *Schlup*, 513 U.S. at 327);
     *Wildman*, 261 F.3d at 842–43.  "[I]f a petitioner ... presents evidence of innocence so strong that
21   a court cannot have confidence in the outcome of the trial unless the court is also satisfied that
     the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass
22   through the gateway and argue the merits of his underlying claim."  *Schlup*, 513 U.S. at 316.
     The term "actual innocence" means factual innocence, not merely legal insufficiency.  *Bousley v.*
23   *United States*, 523 U.S. 614, 623-24 (1998); *Gandarela*, 286 F.3d at 1087.  "[A] colorable
     showing amounts to establishing that it is more likely than not that no reasonable juror would
24   have convicted the petitioner in the light of the new evidence."  *Paradis v. Arave*, 130 F.3d 385,
     396 (9th Cir.1997) (citation omitted).  "This standard is not easy to meet," *id.* at 1086, and is
25   "very narrow."  *Sawyer v. Whitley*, 505 U.S. 333, 341 (1992).  Petitioner has failed to meet this
     exacting standard.  He has not provided evidence which demonstrates that he is factually
26   innocent of the crimes for which he was convicted.

arraignment in cases where the victim is a minor.[10]  (§ 1048, subd. (b).)  The court continued trial until February 18, 2004,[11] after a paralegal in Cameron's employ filed a declaration recounting his conversation with one of the expert witnesses, Dr. Robert Kessler, a Professor of Urology at the Stanford University Medical Center. According to the paralegal, Dr. Kessler had reached a tentative conclusion that defendant's abnormally large penis would have caused significantly more damage to B.'s vaginal area than Relyea had observed.

On February 18, defendant made his second motion to continue trial, based on the recent disclosure of new evidence and the need for further investigation of existing leads.[12]  Over the People's objection, the court postponed the trial a second time, and set a trial setting hearing for April 2.

At the April 2 hearing, Cameron withdrew as defendant's attorney, and defendant filed a declaration of indigency and requested that the court appoint counsel to represent him temporarily, until he was able to raise the funds needed to retain an attorney.  The court continued the trial-setting conference until April 23, and thereafter appointed Thomas Hilligan to represent defendant.

At the April 23 hearing, the court denied defendant's request for a continuance to retain Michael Sharpe, and set a trial date of July 14.

////

---

[10]  Attached to the opposition papers was a letter V.'s mother wrote to the court.  The letter stated that V. was "apprehensive" and under "an enormous amount of stress" waiting for the day she would testify.  V.'s mother stated that "the defense is victimizing her once again." V.'s mother stated that defendant had "many chances" to obtain counsel and prepare his defense, unlike the parents, who "had no time to prepare for the ordeal defendant put upon us."  V.'s mother asked the court to "alleviate the ongoing stalling that the defense is becoming so adept at using."

[11]  Subsequent events in this factual summary occurred in 2004 unless otherwise noted.

[12]  The new evidence consisted of a one-page report prepared on February 11, by Patricia Jones, MS, MFT, who reported that B., during a counseling session held on January 20, disclosed that defendant had committed more than 30 acts of sexual intercourse and more than 20 acts of sodomy.  Cameron stated he needed additional time to investigate B.'s disclosures, which not only greatly increased the number of acts of sexual intercourse involving B., but mentioned anal intercourse for the first time.

Cameron also declared that his investigator, Patrick Maloney, had recently provided him with over 1,200 pages of reports and attached documentation, which contained important evidentiary leads concerning another suspect and possible motives for some of the potential witnesses, to punish defendant.

On July 1, defendant filed his third motion to continue the trial because Hilligan was unprepared for trial.  Hilligan explained that he had let defendant retain the criminal file based on defendant's representations that he would be utilizing the proceeds of an imminent real estate loan to retain either Sharpe or Cameron to represent him.  Commencing June 1 and continuing throughout the month, Hilligan told defendant he needed the file, but defendant did not give it to Hilligan until July 1.  Based on his review of the file that day, Hilligan filed a declaration in which he stated: "It is clear to me beyond question that, even if I remain as defendant's counsel, there is not sufficient time remaining prior to the scheduled trial date for me to fully review them and take [the] appropriate action concerning their contents.  If that action includes the issuance of subpoenas to witnesses, in all probability it will not occur.  The result will be, regardless of fault, defendant likely will not receive [ ] either the benefit of an effective defense or a fair trial."[13]

At a hearing held July 7, the court denied the motion to continue because defendant knew Hilligan needed the file yet failed to provide it.  Observing that "it looks to this Court as if Mr. Shepard is manipulating the process and managing to delay proceedings for months at a time[,]" and that "[t]he process should not and cannot be manipulated in that way," the court denied the motion to continue.

Five days later, and only two days before trial, Hilligan informed the court that he had a conflict of interest, and requested permission to withdraw as defendant's attorney.  The court granted the request, appointed Diane Martin-Logan to represent defendant, and continued the trial until September 15, with a trial readiness conference set for August 16.

At the August 16 conference, defendant again requested a continuance because he was attempting to retain counsel.  The court denied the motion and confirmed the trial date of September 15.

On September 9, defendant filed a notice that Adam Ryan was substituting for Martin-Logan.

On September 13, the court issued an order stating that the court would defer approval of defendant's proposed substitution of attorney pending a hearing, which the court set for the following day.

////

---

[13]  We will refer to these statements as the Hilligan declaration.

On September 13 as well, Ryan filed a motion to continue the trial. According to Ryan's declaration, he received defendant's file on September 9, the day he was retained.  Ryan stated that Martin-Logan had not issued subpoenas to any of the 34 potential witnesses Cameron had disclosed to the prosecutor in February, telling Ryan she planned to call only "local witnesses."  Ryan indicated that he intended to rely on a defense that defendant was not the perpetrator because defendant's unusually large penis would have caused more external trauma to B.'s vagina than Relyea had observed.  Ryan attached Dr. Kessler's one-page report expressing this opinion.  Ryan did not state that he intended to call Dr. Kessler as a witness.  Instead, Ryan intended to contact the other defense medical expert, Dr. Lisa Benaron, who would be able to testify concerning Dr. Kessler's report and her own findings.  Although Ryan had not spoken with Dr. Benaron or seen any report from her, he anticipated her testimony would be consistent with Dr. Kessler's report.  Based on his preliminary review of more than 1,200 pages of investigative reports, Ryan concluded that a 30-day continuance was needed to confer with defendant and prior counsel, and issue subpoenas to witnesses.

At the hearing held on September 14, Martin-Logan stated that she was ready to proceed to trial as scheduled.  Ryan said that he was "not sure" he agreed with Martin-Logan's representation of defendant, that he was ready to go to trial, although he thought there were "good grounds for a continuance."

The court stated, "that the matter was being manipulated by the attempts to retain counsel in order to delay the proceedings."  The court indicated that, "given the representation of Ms. Martin that she is ready to proceed and ready to try the case, and the representation of Mr. Ryan that he is not for whatever reason, the Court is not going to grant the motion to continue."

Defendant stated that he wanted Ryan to represent him because Martin-Logan had talked to him for only five minutes in the month since her appointment,[14] "she hasn't subpoenaed the people that I think are going to be a big help in this matter," and she had not used "her full potential . . . to represent me in the right way."

Martin-Logan stated that she would not respond "in open court," but if defendant made a *Marsden*[15] motion, "I would be heard ."

The court denied the proposed substitution of Ryan, stating, "This request comes very late in the game.  It comes after the defendant has had substantial notice that this case was going to trial.

---

[14]  Martin-Logan actually was appointed two months earlier, on July 12.

[15]  *People v. Marsden* (1970) 2 Cal.3d 118.

18

Continuances have been denied repeatedly.  The defendant has delayed hiring counsel until this late [date].  We have the type of case involving victims where it should have been tried frankly long ago.  The defendant has caused the matter to be delayed substantially.  [¶]  I have an attorney who is competent and ready to proceed to trial.  I have an attorney who, for understandable reasons, is not ready to proceed to trial.  There may be some difference of opinion regarding trial strategy between the defendant, between his current attorney and Mr. Ryan.  But ultimately the court governs whether a substitution would be allowed.  [¶]  It would be a substantial impairment upon the administration of justice if this case was continued further.  And given the indication by Mr. Ryan that he is not ready to proceed and Ms. Martin that she is, the request for substitution is denied."

The following day, prior to the commencement of trial, defendant made a *Marsden* motion to replace Martin-Logan because she had failed to communicate with him consistently, investigate adequately, or use Dr. Kessler's report.  At the hearing, Martin-Logan stated that defendant had not scheduled any appointments, and missed two that she had scheduled.
Martin-Logan stated she had subpoenaed numerous witnesses, and had talked to Dr. Kessler, but decided against calling him because his testimony would be "inflammatory," since "jurors know that when little girls are molested, there is hardly, if ever, full penetration by an adult male . . . [and] any juror would know that, common sense, that were a little girl to have full penetration with a male penis, there obviously would be a lot more damage."
Martin-Logan also expressed concern that Dr. Kessler was subject to impeachment, since she discovered in defendant's file a letter Cameron had written to Dr. Kessler that "directed" Dr. Kessler "to write a letter verbatim as to what Mr. Cameron's letter said [, and] [i]n reviewing the letter from Dr. Kessler, it appears that Dr. Kessler did just that."

Martin-Logan added that she had subpoenaed Dr. Benaron, who could testify concerning B.'s vaginal injuries.  Martin-Logan subsequently decided not to call Dr. Benaron as a witness.  At an in camera hearing, Martin-Logan explained: "When I questioned her about the size of my client's penis, she laughed, and said that obviously he wouldn't put it in all the way; that there was penetration.  She believed it to be a penis.  She said she would be a horrible witness for the defense.  She said she thought not only was the hymen rolled, but that it was basically fragmented and almost nonexistent, and she said that that would be consistent with repeated penetration ."

Resp.'s Lodg. Doc. 4 (hereinafter Opinion) at 5-12.

/////

1    Petitioner argues that the trial court violated his right to counsel by denying his request to

2  substitute attorney Ryan as his trial counsel.  He contends that Ryan was ready to proceed on the

3  day scheduled for trial and that the trial judge should have allowed him to do so.  Dckt. No. 26 at

4  4, 10-11.  He points out that Ryan told the trial judge he was ready to go to trial without a

5  continuance.  *Id.*  He faults the trial judge for failing to question Mr. Ryan about the amount of

6  time he had spent on petitioner's case or about the extent of Ryan's preparedness.  *Id.* at 4.

7  Petitioner also argues that Mr. Ryan was more prepared for trial than Ms. Martin-Logan was.  *Id.*

8  He asserts that Martin-Logan could not have been prepared for trial because she did not have any

9  of petitioner's case files, having given them to Ryan after petitioner told her he was going to hire

10  Ryan.  *Id.* at 13.  He also states that Martin-Logan had not subpoenaed any witnesses at the time

11  of trial.  *Id.* at 12-13.

12    Petitioner points out that his notice of substitution of counsel was filed seven days prior

13  to trial and argues that the notice was therefore timely.  *Id.* at 11.  He suggests that the trial court

14  could have delayed the trial only long enough for Mr. Ryan to subpoena the witnesses that

15  Martin-Logan had failed to subpoena.  *Id.*  He explains that his relationship with Martin-Logan

16  had deteriorated to the point that he was left "with no other choice" but to hire another attorney.

17  *Id.* at 21.

18    The California Court of Appeal rejected these arguments, reasoning as follows:

19         Defendant argues: "The trial court abused its discretion by
          denying [defendant's] substitution of attorney and continuance of
20        [defendant's] trial date to allow his newly-retained counsel to
          subpoena necessary witnesses, and confer with an investigator who
21        had done substantial work on this case.  The motions for
          substitution and for continuance were made for good cause, the
22

23  ////

24  ////

25  ////

26  ////

motions were not dilatory, and [defendant] did not wait until the time of trial to substitute counsel."[16]  These contentions are meritless.

**The Motion to Continue**

Preliminarily, we note that the trial court had before it two separate motions, a motion to substitute retained counsel for appointed counsel and a motion to continue the trial date to permit newly retained counsel to prepare for trial.  The record reflects the court's decision whether or not to grant the motion to substitute counsel was based on whether or not Ryan, the newly retained counsel, was prepared to go to trial without a continuance on September 15.  Thus, the court first heard, considered and then denied the motion to continue and then did the same as to the motion to substitute counsel.  We discuss the motions in the same order as the trial court.

A criminal defendant must show good cause to obtain a continuance of trial (§ 1050, subd. (e)), whether the request is based on the need for further investigation, to secure the attendance of a witness, or to substitute counsel.  (*People v. Sakarias* (2000) 22 Cal.4th 596, 647 [investigation]; *People v. Roybal* (1998) 19 Cal.4th 481, 504 [witnesses]; (*People v. Smithey* (1999) 20 Cal.4th 936, 1011 [substitute counsel].)  We review an order denying a motion to continue for abuse of discretion, whether the motion was premised on the need for further investigation, to secure the attendance of a witness, or to substitute counsel.  (*People v. Sakarias, supra*, at p. 646.)  In making that assessment, we look to the circumstances of each case, paying particular attention to the reasons presented to the trial court at the time the request was denied.  (*People v. Courts* (1985) 37 Cal.3d 784, 791.)

**A**

**Continuance for Further Investigation**

Defendant's motion to continue was premised, in part, on Ryan's need to consult defendant, and defendant's former counsel and Maloney (Cameron's investigator), to review the extensive documentation generated during Maloney's investigation.

////

---

[16]  Although defendant's opening brief makes this argument under one heading, he actually challenges two separate orders, consisting of the denial of his motion to continue trial and the denial of his motion to substitute retained counsel for his appointed counsel.  While there is some overlap in the motion and proposed substitution, they were distinct requests, and the trial court treated them separately.  We will do the same.

21

When a motion to continue is based on the need to conduct further investigation, the court should consider the diligence of defendant and counsel  (*People v. Grant* (1988) 45 Cal.3d 829, 844), the benefit that the moving party anticipates, the likelihood that such benefit will result, the burden on other witnesses, jurors and the court, and whether granting the motion will accomplish or defeat substantial justice.  (*People v. Barnett* (1998) 17 Cal.4th 1044, 1125-1126.)

Maloney's investigative materials were generated no later than early February 2004, when Cameron relied on them in part to obtain defendant's second continuance of trial.  Ryan's motion tried to convey the impression that the materials were an untapped source of potent exculpatory testimony but, aside from mentioning them once, at the conclusion of the motion to continue and a second time in his declaration, defendant made no effort to analyze whether the witnesses identified in Maloney's investigative materials could provide relevant, admissible evidence that could not be established by other witnesses.  There was no attempt to explain what efforts had been made to explore these leads in the eight months that had passed since the second motion to continue was granted.  Ryan implied that Martin-Logan was to blame, but she had represented defendant for only two of the eight months.  Cameron, whose investigator discovered the leads, represented defendant for six weeks after the second continuance.  From that fact the court could infer, in the absence of contrary evidence, that the investigation had continued and that none of the leads proved fruitful.  Even after Cameron withdrew, defendant remained free on bail and capable of conducting his own investigation.  In fact, most of the potential witnesses identified in Maloney's report appeared to have been identified by defendant.

Based on his preliminary review of more than 1,200 pages of reports, Ryan requested only a 30-day continuance.  It was not unreasonable however, for the court to infer that the investigation he proposed would in all likelihood not be completed within that time, let alone completed and incorporated into a defense case that would be ready to go to trial.  Although Ryan had affixed a "30-day" label to the continuance, the court could reasonably conclude this was understated and, in light of the substantial delay to date, further requests to continue would be inevitable.  The trial court acted well within its discretion by denying a motion to continue that was essentially open-ended and unsupported by a showing of what relevant mitigating evidence would be produced.  (*People v. Jenkins* (2000) 22 Cal.4th 900, 1038, citing *People v. Beeler* (1995) 9 Cal.4th 953, 1003-1004.)

In any event, many of the potential witnesses Maloney identified testified at trial and were cross-examined by Martin-Logan, who attempted to establish why the parents of the victims would want to testify falsely.  For example, defendant testified that he had

sexual relations with the mothers of two of the victims, and reported B.'s mother for welfare fraud.  Martin-Logan attempted to establish that V.'s mother and defendant's then-wife were close friends and possibly lovers.  Martin-Logan established that V. continued to visit B. in defendant's presence after defendant had molested V.  Martin-Logan also elicited testimony that B. did not complain to her mother or defendant's mother-in-law about defendant's conduct.

The court did not abuse its discretion by denying a continuance to conduct further investigation, and defendant suffered no prejudice as a result.

**B**

**Continuance to Subpoena Witnesses**

We reach the same conclusion with respect to the denial of a continuance to subpoena the witnesses whom Cameron had identified and Martin-Logan allegedly had failed to subpoena.

Where a defendant seeks a continuance to secure the attendance of a witness, he must establish that "he had exercised due diligence to secure the witness's attendance, that the witness's expected testimony was material and not cumulative, that the testimony could be obtained within a reasonable time, and that the facts to which the witness would testify could not otherwise be proven." (*People v. Howard* (1992) 1 Cal.4th 1132, 1171.)

As the trial court pointed out, one of the premises of defendant's argument for the continuance – that key witnesses would not testify because they had not been subpoenaed – was speculative, since Martin-Logan had announced ready for trial and had presumably made or would make arrangements to secure the attendance of witnesses.

The only witness discussed in any detail was Dr. Benaron, whom Ryan had not even contacted.  Ryan made a prima facie showing that Dr. Benaron's anticipated testimony was material and would not necessarily be established through other witnesses.  However, as the trial court informed defendant, the choice of witnesses was a tactical decision left to the defense counsel's informed judgment. And as Martin-Logan expressed at the subsequent *Marsden* hearing (and the trial court reasonably inferred in ruling on defendant's motion to continue), a defense premised on penis size would be unpersuasive to an average juror and would likely be inflammatory.

The trial court acted well within its discretion when it declined to continue the trial to subpoena witnesses.

**C**

**Continuance to Allow Substitute Counsel to Prepare for Trial**

The final basis for the request for a continuance was Ryan's need to confer with defendant, defendant's former attorneys, and Maloney.  In denying the motion, the principal reason the court gave was defendant's delay in retaining Ryan.  Defendant argues the court's findings are not supported by the record since the previous continuances were based on matters outside of his control and he diligently attempted to retain counsel.

Although "courts should make all reasonable efforts" to allow a defendant to choose his own counsel, if he has the means (*People v.. Crovedi* (1966) 65 Cal.2d 199, 207), a defendant seeking a continuance must give reasons for the delay of proceedings and must show that he has not been dilatory in making such a request. (*People v. Strozier* (1993) 20 Cal.App.4th 55, 60.)

Even if we assume that the first continuance (in October 2003, to secure the attendance of Dr. Kessler), and the second continuance (in February 2004, to evaluate the new disclosures by B., and conduct further investigation), were based on matters outside defendant's control, once defendant declared indigency on April 2, he was solely responsible for the delay.  Over the ensuing five months, defendant's efforts to obtain funds and retain counsel were described in vague terms.  Defendant took his file from Hilligan in June 2004, and did not return it until there was inadequate time to prepare for trial.  While defendant claims he is not responsible for the continuance in July 2004 because it was premised on a conflict of interest claimed by Hilligan, he overlooks that the court had denied his prior motion to continue because defendant was responsible for the delay in returning his file to Hilligan.  It is inferable that Hilligan would have discovered the conflict earlier had defendant timely returned the file to him.

The trial court also correctly concluded that the final motion to continue, which also was based on grounds ostensibly outside of the defendant's control, was untimely and intended to delay trial. Most significantly, defendant failed to explain why he delayed getting his file to Ryan until the day he retained him.  Considering that the Hilligan declaration put defendant on notice that two weeks was plainly insufficient to prepare for trial, the court reasonably could find that defendant intended to delay trial by delivering his file to Ryan less than a week before the scheduled trial date.

////

////

24

**II**

**Motion to Substitute Retained Counsel for Court-Appointed Counsel**

Having denied the motion to continue, the court denied the proposed substitution of attorneys because it was implicitly conditioned on a continuance.  The court also determined that allowing Ryan to represent defendant without a continuance would prejudice the defense.

Although a nonindigent defendant's right to counsel includes the right to retain or discharge a particular attorney (including one appointed by the court while the defendant is indigent) (*People v. Ortiz* (1990) 51 Cal.3d 975, 983), that right " 'must be carefully weighed against other values of substantial importance, such as that seeking to ensure orderly and expeditious judicial administration, with a view toward an accommodation reasonable under the facts of the particular case.'  [Citation.]"  (*People v. Courts, supra*, 37 Cal.3d 784, 790.)  "The trial court, in its discretion, may deny such a motion if discharge will result in 'significant prejudice' to the defendant [citation], or if it is not timely, i.e., if it will result in 'disruption of the orderly processes of justice' [citations]."  (*People v. Ortiz, supra*, at p. 983; *see Ungar v. Sarafite* (1964) 376 U.S. 575, 589 [11 L.Ed.2d 921] [decision to

grant or deny a continuance to retain different counsel is discretionary]; *see People v. Jones* (1998) 17 Cal.4th 279, 318.)

Initially, we reject the suggestion that the court was bound to accept Ryan's representation that he was prepared to proceed to trial without a continuance.  Ryan's statement proved no more than he was ready to proceed, not that he was ready to proceed competently.  In his declaration filed a day before the hearing, Ryan concluded that a 30-day continuance was needed.  The motion to continue itself contradicted Ryan's claim of being ready to proceed, since it was based on Ryan's need to familiarize himself with the case.  The motion, combined with Ryan's statement at the hearing that he was ready to go to trial was conflicting and equivocal.  The court was correct in rejecting Ryan's trial readiness representation.

In an attempt to circumvent these conclusions, defendant argues that, on the record before the trial court, Ryan was no less prepared than Martin-Logan, a situation that removed from consideration Ryan's lack of preparation, and magnified the significance of defendant's preference for Ryan.  Considering that this and the other factors were neutral or supportive of a substitution of attorneys, the order denying the motion to substitute counsel was nothing less than an arbitrary denial of his right to counsel of

25

choice.

Contrary to defendant's view, the court was not obliged to infer that Ryan was no less prepared for trial than was Martin-Logan. The court appointed Martin-Logan on July 12, and she announced at the September 14 hearing that she was ready to try the case as scheduled.  From these facts alone, the court could reasonably infer that Martin-Logan had done all of the things one would expect from a competent criminal defense trial attorney, that would include, at a minimum, meeting the defendant, researching the facts and law, devising a trial strategy that serves the defendant's best interests, collecting physical evidence, and marshalling witnesses, either by relying on prosecution witnesses, issuing subpoenas, or making agreements with friendly witnesses.  The court, therefore, properly concluded that permitting Ryan to substitute for Martin-Logan would require a continuance in order for Ryan to represent defendant competently, while Martin-Logan could provide effective representation without a continuance. The trial court has the discretion to deny the defendant's motion to discharge his attorney if it will result in "significant prejudice" to the defendant.  (*Ortiz, supra*, 51 Cal.3d at p. 983.)  The court reasonably concluded that allowing the substitution of Ryan would be to defendant's detriment in light of Ryan's lack of preparation.

The trial court's determination that a further continuance would substantially interfere with the administration of justice also finds ample support in the record.  Section 1048, subdivision (b) specifies that "trial shall be commenced within 30 days after arraignment," in cases in which the victim is a minor.  Here, defendant managed to delay the trial a full year following his arraignment, and for several months after defendant became solely responsible for the delay.

The record supports the court's determination that Ryan was not ready to proceed with trial and that permitting the substitution without a continuance would cause significant prejudice to defendant.  There was no abuse of discretion.

Opinion at 12-22.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  One element of this right is the right of a non-indigent defendant to choose who will represent him.  *Wheat v. United States*, 486 U.S. 153, 159 (1988); *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624–625 (1989); *Powell v. Alabama*, 287 U.S. 45, 53 (1932) ("It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure

counsel of his own choice").[17]   However, the right to counsel of choice "is circumscribed in several important respects."  *Wheat*, 486 U.S. at 159; *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006).  For example, a defendant may not choose a lawyer whom he cannot afford, who is not willing to represent him, who has a conflict of interest, or who is not a member of the bar.  *Wheat*, 486 U.S. at 159.  In addition, it is well-established that a trial court is entitled to "wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar."  *Id.* at 152 (citation omitted).  A defendant who establishes that his right to counsel of choice was violated "need not demonstrate prejudice in order to be entitled to relief, as a defendant claiming ineffective assistance of counsel is required to do."  *Gonzalez-Lopez*, 548 U.S. at 144.

On habeas review, a trial court's denial of choice of counsel is reviewed for abuse of discretion by balancing the defendant's right of chosen counsel with concerns of fairness and scheduling.  *Miller v. Blacketter*, 525 F.3d 890, 896 (9th Cir. 2008).  Trial courts retain the discretion to "make scheduling and other decisions that effectively exclude a defendant's first choice of counsel."  *Id.* at 895.  *See also Morris v. Slappy*, 461 U.S. 1, 11 (1983) ("broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel"); *United States v. Walters*, 309 F.3d 589, 592 (9th Cir. 2002) ("A criminal defendant's exercise of [his] right [to counsel of choice] cannot unduly hinder the fair, efficient and orderly administration of justice.").  The court's discretion in this regard must be exercised in light of several factors, including: (1) whether new counsel had been hired at the time of a request for a change of attorney; (2) whether current trial counsel is prepared for

////

-----

[17]  The right to counsel of choice "does not extend to defendants who require counsel to be appointed for them."  *Bradley v. Henry*, 510 F.3d 1093, 1098 (9th Cir. 2007) (quoting *Gonzalez-Lopez*, 548 U.S. at 151).

1  trial; and (3) the timing of defendant's motions for continuance or a change of counsel.  *Miller*,

2  525 F.3d at 896–97.

3         Balancing the relevant factors here, the court concludes that petitioner's right to counsel

4  of choice was not violated by the trial court's refusal to allow the substitution of attorney Ryan

5  on the eve of trial.  With regard to the first two factors, it is true that petitioner had retained

6  attorney Ryan at the time he requested a change of counsel.  However, as discussed by the

7  California Court of Appeal, Ryan was not wholly prepared to start trial on the day that trial was

8  scheduled to begin.  He filed a motion to continue the trial four days after the substitution of

9  attorney form was filed and several days before trial was scheduled to start.  Resp.'s Lodg. Doc.

10  1, Clerk's Transcript on Appeal (hereinafter CT), at 127-28, 130-33.  The trial court

11  subsequently issued a minute order setting a hearing to review whether to continue the trial and

12  whether to accept the substitution of counsel.  *Id.* at 129.  At that hearing, attorney Ryan made it

13  clear that, while he was willing to proceed to trial, he was not actually ready to do so.  He

14  explained that he was "ready to go to trial with what I have," but he believed there were

15  "certainly crucial bits of information that I think give good grounds for a continuance."  Resp.'s

16  Lodg. Doc. 14, Reporter's Transcript on Appeal (hereinafter RT) at 79.  Similarly, Ryan

17  informed the court that, while he was "prepared to go forward with what is presently constituted

18  as evidence," he believed there were "witnesses that cannot be subpoenaed at this late date either

19  by me or by other counsel, given the late date without a continuance."  *Id.* at 84.

20         At a later point in the hearing, Ryan stated, "if the court is asking me to withdraw my

21  motion to continue and substitute in the case and answer 'ready,' I can't do that."  *Id.* at 86.  The

22  following exchange then occurred:

> THE COURT:  "Well, if Mr. Ryan comes back to the Court and
> says, 'I am ready to go, I don't need a continuance,' that would
> change the situation substantially.  But at this point that's not the
> representation."

25  ////

26  ////

28

1       MR. RYAN: No.

2       THE COURT: The representation is 'I am not ready to go.'"

3    *Id.* at 87.  At another point in the proceedings, the court explained to petitioner that his retained

4    counsel had indicated to the court, by the filing of a motion for continuance, that he was not

5    ready to proceed to trial and that "the indication is that he is not ready to go." *Id.* at 82, 83.

6    Petitioner stated that he understood that. *Id.* at 82.  Under these circumstances, the trial court did

7    not act unreasonably in determining that Ryan was not prepared to proceed with the trial as

8    scheduled. *Cf. Gonzalez-Lopez*, 126 S.Ct. at 2560-61 (prosecution conceded that the trial court

9    wrongfully denied the petitioner's right to counsel of choice where the new attorney was willing

10   and prepared to begin representation immediately); *Bradley*, 510 F.3d at 1096 (trial court

11   violated petitioner's right to counsel of choice when newly retained counsel assured the court

12   that he "would be ready by the date appointed for trial").

13      It also appears to the undersigned, as it did to the Court of Appeal, that there is a

14   reasonable likelihood Ryan would have requested another trial continuance if he were allowed to

15   proceed as petitioner's counsel.  The court notes in this regard that Ryan had apparently chosen

16   to present a different defense than Ms. Martin-Logan had decided to use.  It is reasonable to

17   assume that Ryan would have needed more time to formulate and prepare that defense.  On the

18   other hand, Martin-Logan stated unequivocally that she was ready to proceed to trial.  RT at 79.

19   Although petitioner informed the trial court that he did not wish to proceed with Martin-Logan

20   because she hadn't conducted sufficient investigation or prepared the defense that he thought

21   should be presented, (RT at 81-82), "there is no automatic right to a substitution of counsel

22   simply because the defendant informs the court that he is dissatisfied with appointed counsel's

23   performance." *Jackson v. Ylst*, 921 F.2d 882, 888 (9th Cir. 1990).  *See also Miller*, 525 F.3d at

24   897 (stating that the Ninth Circuit is "unaware of any [Supreme Court precedent] that stands for

25   the proposition that the Sixth Amendment is violated when a defendant is represented by a

26   lawyer free of conflicts of interests, but with whom the defendant refuses to cooperate because of

1   dislike or distrust") (quoting *Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th Cir. 2008)).  On

2   balance, the court concludes that both the first and the second factors outlined in *Miller* weigh

3   against petitioner.

4          The third factor, whether the request for substitute counsel was timely, also weighs

5   against petitioner.  The form filed by petitioner to substitute Mr. Ryan as his counsel was filed

6   one week before trial was scheduled to begin.  Ryan's motion for a trial continuance was filed

7   two days before trial was scheduled to begin, and both matters were set on the trial court's

8   calendar one day prior to trial.  As described by the California Court of Appeal, petitioner's trial

9   had been continued numerous times, always at the behest of petitioner.  At one point, petitioner's

10  trial counsel informed the court that he was unprepared to proceed to trial on the date scheduled

11  because petitioner had refused to give him the court file.  In response, the trial court opined that

12  petitioner was "manipulating the process" in an attempt to delay the proceedings.  Opinion at 8.

13  At the hearing on the motion to substitute Mr. Ryan as petitioner's counsel, the trial judge

14  articulated his "suspicion [that] for some time . . . the matter was being manipulated by the

15  attempts to retain counsel in order to delay the proceedings."  RT at 81.  The judge also stated

16  that petitioner "has caused the matter to be delayed substantially."  *Id.* at 83.  Under these

17  circumstances, petitioner's newest attempt to substitute counsel and continue the trial was

18  untimely.  *See Miller*, 525 F.3d at 897-98 (trial court was justified in denying a motion for

19  continuance to substitute retained counsel where petitioner sought to replace current counsel on

20  the morning of trial); *Wheat*, 486 U.S. at 157 (trial court did not abuse its discretion in denying a

21  motion for substitution of counsel two days before trial); *Houston v. Schomig*, 533 F.3d 1076,

22  1079 (9th Cir. 2008) (trial court acted within its discretion when it denied defendant's motion to

23  substitute retained counsel filed four days before trial where the only basis for the motion was

24  that defendant thought current trial counsel was unprepared); *McDonald v. Haws*, No.

25  08cv00652 L(PCL), 2011 WL 768130, at *45 (S.D. Cal. Feb. 8, 2011) (request to substitute

26  counsel made one week before trial was untimely).

1    Apart from Mr. Ryan's apparent unpreparedness to proceed to trial immediately, the trial

2  court articulated several other reasons for its decision to deny petitioner's request for substitute

3  counsel.  Specifically, the court noted that the request was made "very late in the game" and

4  after petitioner had "substantial notice that this case was going to trial;" that earlier requests for

5  continuance had "been denied repeatedly;" and that the case involved child witnesses and

6  therefore, under state law, should have been heard much earlier.  RT at 83.  The trial court also

7  expressed its opinion that "it would be a substantial impairment upon the administration of

8  justice if this case was continued further."  *Id.*  These reasons are supported by the record and

9  constitute good cause for denial of petitioner's motion for substitution of counsel.  The state

10 court record reflects that the trial court carefully balanced petitioner's right to counsel of choice

11 against the needs of fairness, the dictates of California law with regard to the nature of the

12 prosecution against petitioner, and the demands of the court calendar.  The trial court's refusal to

13 continue the trial yet again in order for petitioner to proceed with attorney Ryan was not the kind

14 of "unreasoning and arbitrary insistence on expeditiousness that clearly established federal law

15 prohibits."  *Miller*, 525 F.3d at 989.

16    The decision of the California Court of Appeal rejecting petitioner's Sixth Amendment

17 claim is not contrary to or an unreasonable application of federal law, as set forth by the United

18 States Supreme Court.  Certainly, the state court's decision was not "so lacking in justification

19 that there was an error well understood and comprehended in existing law beyond any possibility

20 for fairminded disagreement."  *Harrington*, 131 S. Ct. at 786-87.  Accordingly, petitioner is not

21 entitled to habeas relief on this claim.  Nor did the trial court's ruling on his motion for substitute

22 counsel "infect [petitioner's] entire trial with [an error] of constitutional dimension."  *White*, 874

23 F.2d at 603.  Accordingly, petitioner has failed to show sufficient prejudice to overcome the

24 procedural bar imposed by the California Supreme Court on this claim.  *Id.*

25 ////

26 ////

### 3.  Ineffective Assistance of Counsel (Claim Two)

In his second claim for relief, petitioner argues that his trial counsel rendered ineffective assistance in "overriding petitioner's request that Dr. Kessler be used as an expert witness for Petitioner's defense."  Dckt. No. 1 at 4; Dckt. No. 26 at 22-25.  Petitioner contends, in essence, that his trial counsel should have called Dr. Kessler as an expert witness in order to support a defense that petitioner could not have been the perpetrator of the charged crimes because his unusually large penis would have caused more physical trauma to B than was observed by the medical personnel who examined her.  As explained above, petitioner's trial counsel decided not to present this defense because she concluded it was not in petitioner's best interests to do so.

To support a claim of ineffective assistance of counsel, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. *Id*. at 690; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  Second, a petitioner must establish that he was prejudiced by counsel's deficient performance.  *Strickland*, 466 U.S. at 693-94. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  *Id*.

As explained above, at the *Marsden* hearing Martin-Logan stated that, after reviewing Dr. Kessler's report, she decided not to call him as a witness because she believed his testimony would be unduly inflammatory.  She also concluded that Kessler was subject to impeachment because he had written his report in the exact language suggested by petitioner's former trial counsel.  Specifically, Martin-Logan explained:

////

32

1
2
3
4
5

> In reviewing the file, there was a letter from Dane Cameron, and in that letter he told Dr. Kessler exactly what he wanted him to say in his report. That letter was on Dane Cameron's letterhead. It was directed to Dr. Kessler to write a letter verbatim as to what Mr. Cameron's letter said. In reviewing the letter from Dr. Kessler, it appears that Dr. Kessler did just that. That letter directed Dr. Kessler what he was to find in his examination and what he was to say.

6
7

Dckt. No. 1-1 at 13. Martin-Logan also explained that she had decided against presenting a defense based on the size of petitioner's penis because:

8
9
10
11
12

> jurors know that when little girls are molested, there is hardly, if ever, full penetration by an adult male. I believe any juror would know, common sense, that were a little girl to have full penetration with a male penis, there obviously would be a lot more damage. I believe a juror could believe that a tip of a penis or some other portion entered and caused the damages indicated on the girl, so I did not subpoena Dr. Kessler. I had concerns it would be inflammatory.

13
14
15
16
17

*Id.* at 5.[18] Instead of a defense supported by the testimony of Dr. Kessler, Martin-Logan chose to establish that the prosecution witnesses had a motive to fabricate evidence against petitioner and, in the case of the child witnesses, were not telling the truth. Counsel presented this defense through the testimony of several witnesses, including petitioner, and through cross-examination of the prosecution witnesses. RT at 263-324.

18
19
20
21
22
23
24

Reasonable tactical decisions, including decisions with regard to the presentation of the case, are "virtually unchallengeable." *Strickland*, 466 U.S. at 687-90. "The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2nd Cir. 1987). Petitioner has failed to overcome the strong presumption that Martin-Logan's decision not to call Dr. Kessler as a witness was a reasonable tactical decision and sound trial strategy. As discussed below, Martin-Logan made a reasonable

25
26

_____

[18] The court also notes that Dr. Kessler's testimony would have had little or no bearing on the charges involving victim V.

1    decision to reject a defense based on the testimony of Dr. Kessler and to proceed with a different

2    defense instead.  Because Martin-Logan's decision not to call Dr. Kessler as a witness was based

3    on a reasonable tactical decision, it did not constitute ineffective assistance.  *Strickland*, 466 U.S.

4    at 690-91.  *See also United States v. Opplinger*, 150 F.3d 1061, 1071-72 (9th Cir. 1998),

5    *overruled on other grounds* by *United States v. Contreras*, 593 F.3d 1135 (9th Cir. 2010) (per

6    curiam) (a decision not to call a witness based upon sound logic and tactics does not constitute

7    ineffective assistance of counsel); *Morris v. California*, 966 F.2d 448, 456 (9th Cir.1991) (a

8    tactical decision not to call a particular witness cannot form the basis of a ineffective assistance

9    of counsel claim, even if the defendant disagrees with the decision).

10          Nor has petitioner demonstrated that counsel's actions in failing to call Dr. Kessler as a

11   witness "infect[ed] his entire trial with [an error] of constitutional dimension." *White*, 874 F.2d

12   at 603.  Accordingly, he has failed to show sufficient prejudice to overcome the procedural bar

13   imposed by the California Supreme Court on this claim.  *Id.*

14                    **4.  Ineffective Assistance of Counsel (Claim Three)**

15          In claim three, petitioner argues that his trial counsel rendered ineffective assistance in

16   failing to "adequately interview . . . both of Petitioner's expert witnesses before trial."  Dckt. No.

17   1 at 5.  Petitioner is apparently referring to Drs. Kessler and Benaron.  The record reflects that

18   Martin-Logan investigated both of these witnesses but simply decided not to present a defense

19   based on their testimony.  As described above, Martin-Logan reviewed Dr. Kessler's report and

20   the information pertaining thereto and spoke personally with Dr. Benaron prior to trial.  *See*, *e.g.,*

21   Dckt. No. 1-1 at 5.  Counsel didn't fail to interview or investigate these witnesses - she decided,

22   for tactical reasons, not to use their testimony.  The fact that petitioner disagrees with counsel's

23   decision in this regard does not mean that his counsel was ineffective.

24          In the traverse, petitioner complains that his trial counsel failed to interview or subpoena

25   other potential witnesses, such as an investigator retained by petitioner, and another man who

26   "could have been the real perpetrator of the alleged crime."  Dckt. No. 26 at 4, 11, 12, 25-27.

                                               34

Petitioner suggests possible testimony that these witnesses might have given, and asserts that "minimal investigation would have revealed their usefulness during trial." *Id.* at 25.  These allegations fail to establish prejudice.  *See Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001) (petitioner failed to establish prejudice where he did "nothing more than speculate that, if interviewed," the witness would have given helpful information); *Wildman*, 261 F.3d at 839 (speculating as to what expert witness would say is not enough to establish prejudice); *Dows v. Wood*, 211 F.3d 480, 486-87 (2000) (no ineffective assistance of counsel for failure to call witnesses where petitioner did not identify an actual witness, provide evidence that the witness would testify, or present an affidavit from the alleged witness); *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) (same); *United States v. Harden*, 846 F.2d 1229, 1231-32 (9th Cir. 1988) (no ineffective assistance because of counsel's failure to call a witness where, among other things, there was no evidence in the record that the witness would testify); *United States v. Berry*, 814 F.2d 1406, 1409 (9th Cir. 1987) (appellant failed to meet prejudice prong of ineffectiveness claim because he offered no indication of what potential witnesses would have testified to or how their testimony might have changed the outcome of the hearing).  Petitioner's own opinion as to what potential witnesses would have said is insufficient for this purpose.  Without direct evidence that specific witnesses would have testified in a manner that might have led to a different result at trial, petitioner's allegations are insufficient to support his claim that Martin-Logan's failure to investigate witnesses constituted ineffective assistance of counsel.

Petitioner also claims throughout the petition and traverse that Martin-Logan failed to subpoena any witnesses prior to trial.  However, during the *Marsden* hearing Martin-Logan stated that she had "subpoenaed numerous witnesses to testify in this matter," such as "Dr. Benaron, Briel Cushman, Molly Cushman, Michelle Shepard, Jacoby Cushman, Sarah Ashworth, Andrew Hinds, Teri Sedrick, Nicole Burroughs, Sandra Relyea, Cynthia Nylander, Shirley Heston Wise, Mary Dowell . . . [and] other witnesses who were mentioned on the People's witness list."  Dckt. No. 26, Ex. K.  It appears that Martin-Logan may have interviewed

and subpoenaed certain witnesses but later decided not to present a defense based on their

testimony.  There is no evidence that she failed to investigate potential witnesses in preparation

for petitioner's trial or that she failed to obtain the attendance of any witness she deemed

necessary for the defense case.  As noted by the California Court of Appeal, "many of the

potential witnesses Maloney identified testified at trial and were cross-examined by Martin-

Logan."  Opinion at 15-16.

Petitioner has failed to show that Martin-Logan's alleged failure to investigate and

subpoena witnesses "infect[ed] his entire trial with [an error] of constitutional dimension."

*White*, 874 F.2d at 603.  Therefore, petitioner has failed to show sufficient prejudice to overcome

the procedural bar imposed by the California Supreme Court's decision on this claim.

### 5.  Denial of Marsden Motion (Claim Four)

In claim four, petitioner argues that the trial court improperly denied his *Marsden* motion

to replace Martin-Logan on the grounds that she and petitioner "were no longer on speaking

terms and thereafter, counsel refused to present any witnesses at petitioner's trial."  Dckt. No. 1

at 5.  Petitioner explains that after the trial court denied his motion for substitute counsel, he and

Martin-Logan "had a full blown argument" over Martin-Logan's decision not to call Dr. Kessler

as a witness and not to proceed with petitioner's "large penis defense."  Dckt. No. 26 at 14, 30.

He states that Martin-Logan "concealed" from him that she "did not investigate petitioner's

case," and had failed to "interview any of petitioner's witness[es]."  *Id.* at 30.  He further states

that Martin-Logan did not tell him she wasn't going to call Dr. Kessler as a witness until "just

hours before trial."  *Id.* at 30-31.  Petitioner explains that this situation left him with no

alternative but to file a motion for substitute counsel.  *Id.* at 31.  He states that Martin-Logan

"hid the true fact of the conflict from the trial judge" during the *Marsden* hearing; therefore, the

trial judge determined there was "no conflict."  *Id.*

The record before the court does not include the transcript of petitioner's *Marsden*

hearing.  *See* RT at 89-104 (pages excluded from the record).  Respondent represents that he is

1   unable to obtain a copy of the transcript because petitioner did not raise a *Marsden* claim in the

2   California Court of Appeal.  Two pages of the *Marsden* hearing are contained in the record

3   lodged by respondent.  *See* Resp.'s Lodg. Doc. 12, Exs. A, B.  Petitioner did not include the

4   transcript of the *Marsden* hearing in the documents he filed with the court.

5       Pursuant to *People v. Marsden*, 2 Cal. 3rd 118 (1970), when a criminal defendant in

6   California asserting inadequate representation seeks to discharge appointed counsel and

7   substitute another attorney, the trial court must permit him to explain the basis of his contention

8   and to relate specific instances of the attorney's inadequate performance.  The denial of a

9   *Marsden* motion to substitute counsel can implicate a criminal defendant's Sixth Amendment

10  right to counsel and is properly considered in federal habeas corpus.  *Bland v. California Dep't of*

11  *Corrections*, 20 F.3d 1469, 1475 (9th Cir. 1994), *overruled on other grounds* by *Schell v. Witek*,

12  218 F.3d 1017 (9th Cir. 2000) (en banc).  On habeas review, the relevant inquiry is whether the

13  state trial court's disposition of the *Marsden* motion violated petitioner's right to counsel

14  because the asserted conflict "had become so great that it resulted in a total lack of

15  communication or other significant impediment that resulted in turn in an attorney-client

16  relationship that fell short of that required by the Sixth Amendment."  *Schell*, 218 F.3d at 1027-

17  28.  The Sixth Amendment guarantees effective assistance of counsel, but not a "meaningful

18  relationship" between an accused and his counsel.  *Morris*, 461 U.S. at 14.

19      The United States Supreme Court has not specifically addressed the level of inquiry

20  required when a *Marsden* motion or similar motion is made by a criminal defendant.  When

21  assessing a trial court's ruling on a *Marsden* motion in the context of a federal habeas corpus

22  proceeding, the Ninth Circuit has held that the Sixth Amendment requires only "an appropriate

23  inquiry into the grounds of such a motion, and that the matter be resolved on the merits before

24  the case goes forward."  *Schell*, 218 F.3d at 1025.

25      Here, the trial court gave petitioner the opportunity to explain his reasons for wanting to

26  substitute another attorney for Martin-Logan.  From what the undersigned can determine based

37

1  on the limited record before the court, the trial judge asked Martin-Logan to respond to

2  petitioner's complaints and satisfied himself that her representation was adequate.  Although

3  petitioner states that he and Martin-Logan did not agree on the defense strategy, this

4  disagreement did not result in a "complete breakdown" in communications between petitioner

5  and his trial counsel.  Ms. Martin-Logan was able to mount a competent defense, with petitioner

6  as one of the trial witnesses.  Although petitioner disagreed with the defense strategy that his

7  counsel had selected, "[d]isagreements over strategical or tactical decisions do not rise to [the]

8  level of a complete breakdown in communication."  *Stenson v. Lambert*, 504 F.3d 873, 886 (9th

9  Cir. 2007) (citing *Schell*, 218 F.3d at 1026.).

10         The factual record was sufficient to allow the trial court to make an informed decision

11  that petitioner's claim of conflict did not require substitute counsel.  *See Stenson*, 504 F.3d at

12  887 (inquiry was adequate when court determined lines of communication were open and

13  counsel was competent); *United States v. Prime*, 431 F.3d 1147, 1155 (9th Cir. 2005) (inquiry

14  was adequate where defendant 'was given the opportunity to express whatever concerns he had,

15  and the court inquired as to [defense attorney's] commitment to the case and his perspective on

16  the degree of communication."); *cf. Schell*, 218 F.3d at 1027 (remanding for evidentiary hearing

17  where state court failed to make any inquiry into alleged deterioration of attorney-client

18  relationship and substance of claims).  The trial court, having inquired into counsel's

19  representation and satisfied itself that representation was adequate, did not violate petitioner's

20  Sixth Amendment rights in denying his *Marsden* motion.

21         For the same reasons, petitioner has failed to demonstrate prejudice sufficient to

22  overcome the procedural bar imposed by the California Supreme Court on this claim.

23                        **6.  Illegal Sentence (Claim Five)**

24         In petitioner's fifth ground for relief, he claims that the trial court violated his Sixth

25  Amendment right to a jury trial when it imposed a sentence "in excess of the statutory

26  maximum."  Dckt. No. 1 at 46.  He argues that he was "entitled to a jury determination of fact to

                                                38

support any punishment greater than the statutory minimum." *Id.* at 47.  Petitioner does not specify which part of his sentence he is challenging.

The state court record shows that petitioner received the mid-term of six years on Count I and a consecutive aggravated term of sixteen years on Count II, for a total term of twenty-two years in state prison.  RT at 405.  The trial court explained petitioner's sentence as follows:

> The Defendant is not ineligible for probation.  But even if probation were otherwise appropriate or otherwise permissible, the Defendant is clearly an inappropriate candidate for probation.  He creates a danger to others if not incarcerated.  He has four prior misdemeanor violations, two of which involve violence.

> The Defendant, at least as to Count II, the violation of 288.5, had a victim who was particularly vulnerable, and the victim was his daughter, which also constitutes a violation of trust.

> Regarding the violation of 288.5(a), the Court finds the factors in aggravation outweigh those in mitigation.  First, the Court finds that the victim in that count was particularly vulnerable, and the victim violated a position of trust due to the fact that he is the victim's father and had visitation with his child.  Those issues may be subject to *Blakely v. Washington*.  While the Court finds that they would be sufficient, either individually or collectively, to warrant an aggravated term, the Court does not rely upon those factors.  What the Court does rely upon is the fact that between this offense and the other offense, we are talking about separate victims.

> The legislature, for whatever reason, did not include separate victims and special sentencing under 667.61(d), (c) and (e) in the possibility of a 15-to-life term.  Justifying that logically is a little difficult for the Court since basically we are talking about the same kind of conduct, and 288.5 may be even more egregious than two counts of 288(a).  However, because the legislature felt that that was sufficient to aggravate, it would be a non sequitur for the Court not to believe that two separate victims with offenses being perpetrated at or about the same time is not a sufficient aggravating factor in order to increase the term from the mid-term of 12 years to 16 years.

> The Court notes that under Rule 4.408, the Court is allowed to consider factors which do not fall within the Rule of Court criteria for aggravation, and the Court does so in this case, noting that the primary objective of sentencing is to protect society.  And in this case it appears to the Court that society needs to be protected.

////

> Furthermore, the Court also finds that a consecutive term is appropriate because not only – well, the Court has previously found they involve disparate victims; but additionally, these were offenses that were committed at separate times and separate places, and did not constitute a single act of aberrant behavior on behalf of the Defendant.
>
> For Count I, the violation of 288(a) of the Penal Code, the Defendant is committed to State Prison for the mid-term of six years.
>
> For Count II, the violation of 288.5(a) of the Penal Code, the Defendant is committed to a consecutive aggravated term of 16 years.  Specifically that sentencing is under Penal Code Section 667.6(c), and the Court chooses that section over 1170.
>
> The Court therefore orders the Defendant is to serve 22 years in State Prison, with credit for 57 days he has already served.

*Id.* at 404-05.  Therefore, in imposing the upper term on Count II, the sentencing judge relied on one aggravating factor: that petitioner's offenses involved two victims.[19]

A criminal defendant is entitled to a trial by jury and to have every element necessary to sustain his conviction proven by the state beyond a reasonable doubt.  *U. S. Const. Amends.* V, VI, XIV.  In *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment requires any fact other than a prior conviction that "increases the penalty for a crime beyond the prescribed statutory maximum" to be "submitted to a jury and proved beyond a reasonable doubt."  In *Blakely v. Washington*, 542 U.S. 296, 303-04 (2004), the Supreme Court decided that a defendant in a criminal case is entitled to have a jury determine beyond a reasonable doubt any fact that increases the statutory maximum sentence, unless the fact was admitted by the defendant or was based on a prior conviction.  In *United States v. Booker*, 543 U.S. 220 (2005), the United States

---

[19]  Under California law, only one valid aggravating factor need be found to authorize an upper term sentence.  *Butler v. Curry*,  528 F.3d 624, 651 (9th Cir. 2008); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 676 n.1 (9th Cir. 2009).  *See also Moore v. Evans*, No. 2:09-cv-2737-JFM (HC), 2010 WL 4290080, at *9 (E.D. Cal. Oct. 22, 2010); *Armstrong v. Small*, No. CV 07-1101 RGK (FMO), 2009 WL 863351, at *17 (C.D. Cal. Mar. 30, 2009).

1   Supreme Court applied *Blakely* to the Federal Sentencing Guidelines.  The court clarified that

2   "'the statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose

3   solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Id.* at

4   232.  In *Cunningham v. California*, 549 U.S. 270 (2007), the Supreme Court held that

5   California's Determinate Sentencing Law (DSL) violates a defendant's right to a jury trial to the

6   extent it permits a trial court to impose an upper term based on facts found by the court rather

7   than by a jury.  The court also determined that the middle term under the DSL is the maximum

8   term that may be imposed on the basis of the jury's verdict alone.  *Id.* at 288.  The California

9   Legislature responded to this determination by amending California Penal Code § 1170(b) to

10  vest sentencing courts with the discretion to impose the lower, middle or upper terms without

11  making specific factual findings, thereby making the upper term the maximum term under

12  California law.  *See People v. Sandoval*, 41 Cal. 4th 825, 844-52 (2007).  The Ninth Circuit

13  subsequently held that *Cunningham* may be applied retroactively on collateral review.  *Butler v.*

14  *Curry*, 528 F.3d at  639.

15          To the extent petitioner is claiming that the sentencing court's imposition of the upper

16  term on count II violates the Sixth Amendment, the court concludes that any error is harmless.

17  *See Washington v. Recuenco*, 548 U.S. 212, 218-22 (2006) (*Apprendi* errors are subject to

18  harmless error analysis).  Petitioner is entitled to habeas relief only upon a showing that the

19  violation of his constitutional rights had a "substantial and injurious effect or influence in

20  determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).  Here, it is

21  undisputed that the jury convicted petitioner of assaulting two separate victims.  Thus, there is no

22  doubt that a jury would have found petitioner eligible for the upper term based on the fact that

23  there were two victims in this case.  Accordingly, the result would have been the same if this

24  issue had been submitted to the jury.  For this reason, any error by the trial judge in imposing the

25  upper term on Count II was harmless.

26  ////

41

1    To the extent petitioner is arguing the sentencing judge violated the Sixth Amendment

2  when he imposed consecutive sentences, his claim lacks merit.  In *Oregon v. Ice*, 555 U.S. 160

3  (2009), the United States Supreme Court held that judges have discretion to determine whether

4  sentences are imposed consecutively or concurrently under the rules announced in *Apprendi* and

5  *Blakely*.  The Court found that "[t]he decision to impose sentences consecutively is not within

6  the jury function that 'extends down centuries into the common law.'"  *Id.* at 717 (quoting

7  *Apprendi*, 530 U.S. at 477).  Instead, "specification of the regime for administering multiple

8  sentences has long been considered the prerogative of state legislatures."  *Id.* The Sixth

9  Amendment does not prohibit trial judges from finding facts necessary to support the imposition

10  of consecutive, rather than concurrent, sentences.  *Id.* at 716-19.[20]  Accordingly, petitioner is not

11  entitled to relief on this claim.  For the same reasons, petitioner has failed to demonstrate

12  prejudice sufficient to overcome the procedural bar imposed by the California Supreme Court on

13  this claim.

14              **7.  Ineffective Assistance of Counsel/Conflict of Interest (Claim Six)**

15    In claim six, petitioner argues that counsel Martin-Logan "labored under an actual

16  conflict of interest . . . after Petitioner retained Mr. Adam Ryan to be Petitioner's trial counsel."

17  Dckt. No. 1 at 6.  Petitioner alleges that "from day one, counsel refused to familiarize herself

18  with petitioner's case" and "made no attempt to even establish an attorney-client relationship

19  with her own client."  Dckt. No. 26 at 27.  He states that this situation constituted a "clear

20  conflict of interest" which caused him to file a *Marsden* motion "on the first day of trial."  *Id.*

21  Petitioner repeats that he and Martin-Logan were not in agreement on the proper defense strategy

22  and that Martin-Logan failed to follow several of his suggestions regarding the cross-

23

24      [20]  Applying *Ice* in this case does not violate the non-retroactivity principle set forth in
*Teague v. Lane*, 489 U.S. 288 (1989) because the rule set forth in *Ice* is an "old rule" that is
25  dictated by historical practice and precedent.  *See Blanco v. Almager*, No. EDCV 07-346-RSWL
(MAN), 2011 WL 4579142, at *23 n.20 (C.D. Cal., June 6, 2011); *Miers v. Mendoza-Powers*,
26  No. 2:07-CV-4410FVS, 2010 WL 3619458, at **14 -15  (E.D.Cal., Sept. 13, 2010).

1   examination of prosecution witnesses and the calling of defense witnesses.  *Id.* at 17-18.  He also

2   claims that Martin-Logan failed to prepare him for his testimony or otherwise prepare him for

3   trial, and that he and Martin-Logan "no longer spoke to one another after petitioner retained new

4   counsel."  *Id.* at 19.  Petitioner argues that this "conflict" caused Martin-Logan to be evasive

5   with him as to how she intended to structure his defense and which witnesses she intended to

6   call, and prevented her from investigating his case or preparing adequately for trial.  *Id.* at 27.

7   According to petitioner, this conflict also resulted in Martin-Logan having a meeting with the

8   prosecutor and explaining the defense strategy to her, thereby giving the prosecutor "the

9   advantage in gaining a conviction."  *Id.* at 28.[21]

10      The Sixth Amendment right to counsel includes the right to counsel of undivided loyalty.

11  *Wood v. Georgia*, 450 U.S. 261, 271-72 (1981).  In *Cuyler v. Sillivan*, 446 U.S. 335 (1980), the

12  United States Supreme Court established the principle that courts should "forgo individual

13  inquiry into whether counsel's inadequate performance undermined the reliability of the verdict

14  in instances where assistance of counsel has been denied entirely or during a critical stage of the

15  proceeding." 446 U.S. 335, 348 (1980).  The Ninth Circuit has described this principal as the

16  "*Sullivan* exception" to the rule that a habeas petitioner must show prejudice in connection with

17  an ineffective assistance of counsel claim.  *See Earp v. Ornoski*, 431 F.3d 1158, 1183 (9th Cir.

18  2005).  Although a defendant alleging a conflict of interest "need not demonstrate prejudice," he

19  must prove that "counsel actively represented conflicting interests."  *Sullivan*, 446 U.S. at 350.

20  "In order to demonstrate a violation of his Sixth Amendment rights on the basis of an alleged

21  conflict, a defendant must establish that an actual conflict of interest adversely affected his

22  lawyer's performance."  *Id.* at 348.  *See also Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002) (an

23

24      [21]  Attached to the traverse is a declaration by the prosecutor in this case wherein she
25  states that she engaged in a pre-trial conversation with Martin-Logan in which she and Martin-
    Logan agreed that the proposed testimony by Dr. Kessler would anger the jury and possibly
26  cause the jury to "visualize" the molestations, which would be damaging to petitioner's case.
    Dckt. No. 26, Ex. H.

43

1    actual conflict "is not something separate and apart from adverse effect" but is "a conflict of

2    interest that adversely affects counsel's performance"); *Hovey v. Ayers*, 458 F.3d 892, 908 (9th

3    Cir. 2006).  Courts "generally presume that the lawyer is fully conscious of the overarching duty

4    of complete loyalty to his or her client."  *Burger v. Kemp*, 483 U.S. 776, 784 (1987).

5         The Supreme Court has never held that the *Sullivan* holding applies to conflicts stemming

6    from disagreements between a lawyer and his client as to the defense strategy.  *See Foote v. Del

7    Papa*, 492 F.3d 1026, 1030 (9th Cir. 2007) (noting that the Supreme Court has never held that

8    the *Sullivan* exception applies to a defendant's "irreconcilable conflict" with his lawyer);

9    *Lambert v. Blodgett*, 393 F.3d 943, 986 (9th Cir. 2004) (noting that Supreme Court precedent is

10   limited to conflicts involving joint representation); *see also Smith v. Hofbauer*, 312 F.3d 809,

11   817 (6th Cir. 2002) (finding that the *Sullivan* line of Supreme Court precedent only apply, for

12   AEDPA purposes, to cases involving joint representation and noting that "[b]ecause the question

13   of whether the Sullivan's lessened standard of proof for a claim of ineffective assistance of

14   counsel based upon an attorney's conflict of interest for anything other than joint representation

15   remains an 'open question' in the jurisprudence of the Supreme Court, and in fact was an open

16   question at the time Petitioner's case was heard, Petitioner's claim fails because it is not based

17   upon clearly established Supreme Court precedent as mandated by AEDPA") (internal citation

18   omitted)).

19        As noted above, the Supreme Court has "reject[ed] the claim that the Sixth Amendment

20   guarantees a 'meaningful relationship' between an accused and his counsel."  *Morris*, 461 U.S.

21   at 13–14.  However, forcing a defendant to go to trial with an attorney with whom he has an

22   irreconcilable conflict amounts to constructive denial of the Sixth Amendment right to counsel.

23   *Brown*, 424 F.2d at 1170.  An irreconcilable conflict in violation of the Sixth Amendment occurs

24   only where there is a complete breakdown in communication between the attorney and client,

25   and the breakdown prevents effective assistance of counsel.  *Schell*, 218 F.3d at 1026.  The Ninth

26   Circuit has rejected the notion that a disagreement with trial strategy amounts to an actual

1  conflict of interest.  *Stenson*, 504 F.3d at 886.  Instead, the constitutional question is whether the

2  conflict between petitioner and his attorney prevented effective assistance of counsel.

3          This case does not involve a complete breakdown of communication between lawyer and

4  client.  Notwithstanding petitioner's allegations, and for the reasons described above, petitioner's

5  disagreement with his trial counsel over the correct defense strategy did not deprive petitioner of

6  the effective assistance of counsel.  The court notes, again, that counsel presented an adequate

7  defense.  She called several witnesses, including petitioner himself, and vigorously cross-

8  examined the prosecution witnesses.  The fact that petitioner testified at his trial is evidence that

9  the lines of communication between himself and Martin-Logan were open.  It is also noteworthy

10  that, at the *Marsden* hearing, the state trial court apparently found no reason to relieve Martin-

11  Logan as petitioner's counsel based on a conflict.  Nor do the facts of this case demonstrate that

12  Martin-Logan was operating under a conflict of interest or that any conflict dictated her

13  performance at trial.  Rather, she chose to reject the trial strategy that petitioner wanted in favor

14  of one that she thought had a better chance of success.  This does not constitute ineffective

15  assistance of counsel.

16          For the foregoing reasons, petitioner has failed to demonstrate that he received

17  ineffective assistance of counsel due to a conflict between himself and his counsel.  He has also

18  failed to show prejudice sufficient to overcome the procedural bar.

19                          **8. Ineffective Assistance of Counsel (Claim Seven)**

20          In his seventh ground for relief, petitioner claims that his trial counsel rendered

21  ineffective assistance in failing to present a "plausible defense at trial."  Dckt. No. 1 at 6.  He

22  contends that counsel "failed to present any evidence to substantiate Petitioners Innocence,"

23  failed to "present any plausible defense witnesses at trial," and "abandoned Petitioner's plausible

24  defense strategy one day before trial began, thus depriving Petitioner of his only defense."  *Id.*

25  Petitioner claims that Martin-Logan "abandoned petitioner's plausible defense strategy just

26  hours before petitioner's trial was to begin, leaving petitioner's jury to hear nothing but ugly and

                                             45

false testimony about petitioner." Dckt. No. 26 at 33. Petitioner also complains that counsel:
(1) "believed it was best not to present vital testimony from petitioner's retained investigator,
who claimed to have evidence to help prove his innocence and to impeach the prosecution's
witnesses;" (2) failed to present testimony from the wife of a man who might have been the
actual perpetrator; (3) failed to "present testimony or evidence concerning the size of petitioner's
penis or the lack of damage found on the alleged victim;" and (4) failed to present "vital
witnesses." *Id.* He also complains that his trial counsel did not effectively cross-examine the
prosecution witnesses, even though they "change[d] their testimony several times concerning the
alleged crime." *Id.* at 34. Petitioner essentially repeats his arguments, described above, that his
trial counsel should have presented a defense using the testimony of Drs. Kessler and Benaron
instead of attempting to discredit the testimony of the prosecution witnesses. *Id.* at 14-15. He
argues that his trial counsel "simply refused to present vital testimony from Dr. Kessler and
numerous other witnesses that were ready, anxious and willing to testify in Petitioner's behalf
and to help impeach the prosecution's witnesses." *Id.* at 37. Petitioner also complains that he
only met with his trial counsel "one (1) or two (2) times" prior to trial and that counsel was not
prepared for trial. *Id.* at 9.

The United States Supreme Court has observed that "[t]he appointed counsel manages
the lawsuit and has the final say in all but a few matters of trial strategy." *Faretta v. California*,
422 U.S. 806, 812 1975). In this regard, "a lawyer may properly make a tactical determination
of how to run a trial in the face of his client's incomprehension or even explicit disapproval."
*Brookhart v. Janis*, 384 U.S. 1, 8 1966. Put another way, "[o]ne of the surest ways for counsel to
lose a lawsuit is to permit his client to run the trial." *Kuhl v. United States*, 370 F.2d 20, 27 9th
Cir. 1966). As stated in *Rhay v. Browder*, 342 F.2d 345, 349 (9th Cir. 1965):

> counsel is the manager of the lawsuit; this is of the essence of the
> adversary system of which we are so proud. In the nature of things
> he must be, because he knows how to do the job and the defendant
> does not. That is why counsel must be there.

1    Thus, while the Supreme Court has recognized a criminal defendant's authority over

2    whether to plead guilty, waive a jury, testify in his own defense or pursue an appeal, *Jones v.*

3    *Barnes*, 463 U.S. 745, 751 (1983), the control over the theory of defense to be presented at trial

4    has been left ultimately to counsel.  *See United States v. Corona-Garcia*, 210 F.3d 973, 977, n. 2

5    (9th Cir. 2000) ("Even if we were to conclude that the conflict with respect to trial tactics was

6    severe, however, we would still be disinclined to reverse on that ground because trial tactics are

7    clearly within the realm of powers committed to the discretion of defense counsel in any

8    event."); *United States v. Wadsworth*, 830 F.2d 1500, 1509 (9th Cir. 1987) ("It is equally clear

9    that appointed counsel, and not his client, is in charge of the choice of trial tactics and the theory

10   of defense"); *United States v. Padilla*, 819 F.2d 952, 956 (10th Cir. 1987) ("[t]he Sixth

11   Amendment provides no right to counsel blindly following a defendant's instructions"); *U.S. ex*

12   *rel. Anderson v. Detella*, No. 96 C 3515, 1996 WL 727397, *6-7 (N.D. Ill. 1996) (rejecting

13   petitioner's habeas claim that he had a constitutional right to choose the defense presented on his

14   behalf at trial on the grounds that the United States Supreme Court has never recognized such a

15   right and that it could not, therefore, serve as the basis for habeas relief).

16   Under the circumstances presented here, counsel was not in error for refusing to allow

17   petitioner to control the theory of defense.  Petitioner does not have a constitutional right to insist

18   on the presentation of a defense which his trial counsel reasonably rejected in favor of another

19   defense.  Petitioner's attorney presented a plausible and reasonable defense case through the use

20   of testimony from several witnesses, including petitioner himself, and rejected a defense that she

21   thought was inflammatory and not helpful.  Petitioner's constitutional rights were not violated by

22   virtue of counsel's decision to do so.

23   It is true that a criminal defense attorney "has a duty to make reasonable investigations or

24   to make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466

25   U.S. at 691.  However, the record reflects that the performance of petitioner's trial counsel fell

26   within these parameters.  Ms. Martin-Logan reviewed the file, chose a plausible defense, and

47

1  subpoenaed and presented witnesses in support of that defense.  The fact that petitioner wanted

2  to call different witnesses and present a different defense does not mean that his trial counsel

3  rendered ineffective assistance.

4        Nor did Martin-Logan fail to obtain the information necessary to decide which defense to

5  present.  On the contrary, she reviewed Dr. Kessler's report, spoke with Dr. Benaron, considered

6  the available options, and chose a defense strategy.  This approach certainly passes constitutional

7  muster.  *Cf. Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994) ("Ineffectiveness is generally

8  clear in the context of complete failure to investigate because counsel can hardly be said to have

9  made a strategic choice when s/he [sic] has not yet obtained the facts on which such a decision

10  could be made"); *United States v. Tucker*, 716 F.2d 576, 583 (9th Cir.1983) (holding that the

11  failure to interview or to attempt to interview key prosecution witnesses constitutes deficient

12  performance).

13        The California Superior Court made the following comments with regard to petitioner's

14  claim that his trial counsel rendered ineffective assistance in her handling of petitioner's trial:

15        Even if the Court assumes everything is true in the Petition and
          Reply to Informal Response submitted by Petitioner, it is not
16        adequate to demonstrate that counsel's performance fell below
          representation by competent counsel, or that there was any
17        reasonable probability of a more favorable outcome.  Even
          Petitioner, at Page 2, lines 3-4 (Reply to Informal Response),
18        indicates only that "it is possible to have raised a reasonable doubt
          of Petitioner's guilt."  Additionally, Petitioner's position that
19        defense counsel failed to investigate is far from clear, since the
          Petition acknowledges that Mr. Maloney submitted a 1,200 page
20        report, and Earl Richter submitted a 200 page report.  Trial counsel
          apparently had 1400 pages of investigative reports.  Given the
21        nature of the case, it would be hard to fathom what additional
          investigation would be reasonably necessary.  What it suggests to
22        the Court is that Petitioner may take exception to the manner in
          which trial counsel presented the defense, but it hardly
23        demonstrates inadequate investigation.  Just because Petitioner and
          Petitioner's current counsel may have presented the defense
24        differently, that fact does not establish ineffective representation,
          and based upon the information in the Petition, any probability of a
25        more favorable outcome is merely speculative.

26  Resp.'s Lodg. Doc. 7 at 2-3.  The record before this court supports that conclusion.

48

1    In addition, as discussed above, counsel was well aware of the testimony that Dr. Kessler

2    could provide but she decided that a defense based on that testimony was inflammatory,

3    unbelievable, and ultimately implausible, and therefore decided not to present it.  Further, after

4    Dr. Benaron informed counsel that she would be a "horrible" witness for the defense, counsel

5    decided not to call her as a witness.  These tactical decisions by counsel were certainly not

6    unreasonable.  In short, petitioner has not demonstrated that counsel's decision to abandon a

7    defense centered on the testimony of Drs. Kessler and Benaron was outside the wide range of

8    professionally competent assistance of counsel.  Nor has he demonstrated that such a defense

9    would have been successful in this case or that investigation of additional witnesses would have

10   resulted in a different result at trial.[22]

11   There is no evidence, and petitioner has not demonstrated, that any error by his trial

12   counsel "infected his entire trial with errors of constitutional dimension."  *White*, 874 F.2d at

13   603.  Accordingly, petitioner's claim in this regard is barred from review and fails on the merits

14   in any event.

### 9.  Ineffective Assistance of Appellate Counsel (Claim Eight)

16   In claim eight, petitioner argues that his appellate counsel rendered ineffective assistance

17   when he "abandoned several reversible issues and attached a Petition for Writ of Habeas Corpus

18   as part of Petitioner's appeal."  Dckt. No. 1 at 5.  Petitioner also claims that his appellate counsel

19   was ineffective in failing to file a petition for review in the California Supreme Court after

20   petitioner's direct appeal was denied, failing to inform petitioner that his appeal had been denied,

21   and refusing to give petitioner his state court records so that he could file his own petition for

22

23       [22] Petitioner informs the court that in his subsequent prosecution for child molestation he
     was acquitted after his defense counsel presented a defense based on Dr. Kessler's testimony.
24   Dckt. No. 26 at 16-17.  Petitioner argues that the same result would have been achieved in the
     instant case if Martin-Logan had relied on the same defense.  *Id.*  This argument is unavailing.
25   The result of each trial turns on the circumstances specific to that case and cannot be compared
     to the result of another trial, which necessarily turns on different circumstances, evidence, and
26   facts.

1    review on a timely basis.  Dckt. No. 1 at 20, 22, 30-33; Dckt. No. 26 at 7.  Petitioner argues that

2    because he did not receive his trial court records until the time for filing a petition for review had

3    expired, he was unable to file a timely petition on his own behalf.  *Id.*  In the traverse, petitioner

4    faults his appellate counsel for failing to "add transcripts to Petitioner's writ of habeas corpus

5    that counsel filed in the California Superior Court and Third Appellate Court to support

6    Petitioner's Ineffective Assistance claim."  Dckt. No. 26 at 7.  He also argues that "not only did

7    counsel fail to present numerous other claims in petitioner's direct appeal, counsel failed to

8    notify his own client of the outcome of petitioner's appeal being denied until one year later." *Id.*

9    at 36.

10          The *Strickland* standards apply to appellate counsel as well as trial counsel.  *Smith v.*

11   *Murray*, 477 U.S. 527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989).

12   However, an indigent defendant "does not have a constitutional right to compel appointed

13   counsel to press nonfrivolous points requested by the client, if counsel, as a matter of

14   professional judgment, decides not to present those points."  *Jones v. Barnes*, 463 U.S. 745, 751

15   (1983).  Counsel "must be allowed to decide what issues are to be pressed."  *Id.*  Otherwise, the

16   ability of counsel to present the client's case in accord with counsel's professional evaluation

17   would be "seriously undermined."  *Id.  See also Smith v. Stewart*, 140 F.3d 1263, 1274 n.4 (9th

18   Cir. 1998) (Counsel is not required to file "kitchen-sink briefs" because it "is not necessary, and

19   is not even particularly good appellate advocacy.")  There is, of course, no obligation to raise

20   meritless arguments on a client's behalf.  *See Strickland*, 466 U.S. at 687-88 (requiring a

21   showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing

22   to raise a weak issue.  *See Miller*, 882 F.2d at 1434.  In order to establish prejudice in this

23   context, petitioner must demonstrate that, but for counsel's errors, he probably would have

24   prevailed on appeal.  *Id*. at 1434 n.9.

25          The performance of petitioner's appellate counsel in failing to present petitioner's claims

26   to the California Supreme Court is sufficient to establish cause for petitioner's procedural default

50

in state court.  However, it does not constitute ineffective assistance of counsel because petitioner is unable to demonstrate prejudice.  As described above, this court has concluded that petitioner's claims of ineffective assistance of trial counsel, denial of his *Marsden* motion, and the imposition of an illegal sentence are not meritorious.  Therefore, petitioner cannot demonstrate that he probably would have prevailed if his appellate counsel had raised these claims on appeal.  *See Rhoades v. Henry*, 638 F.3d 1027, 1036 (9th Cir. 2011) (no prejudice from trial counsel's failure to investigate or raise two claims on appeal where "neither would have gone anywhere").  Appellate counsel's decision not to include these claims in petitioner's direct appeal in state court was "within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson*, 397 U.S. 759, 771 (1970).  Accordingly, he is not entitled to relief on his claim of ineffective assistance of counsel.  For the same reasons, petitioner has failed to demonstrate prejudice sufficient to overcome the procedural bar imposed by the California Supreme Court on this claim.

**III. Conclusion**

For all of the foregoing reasons, IT IS HEREBY ORDERED that:

1. Petitioner's application for a writ of habeas corpus is denied;

2. The court declines to issue a certificate of appealability; and

3. This Clerk is directed to close the case.

DATED:  September 12, 2012.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE